David Glickman v. Commissioner.
Glickman v. Commissioner
Docket No. 24693.
United States Tax Court
1951 Tax Ct. Memo LEXIS 230; 10 T.C.M. (CCH) 454; T.C.M. (RIA) 51144; May 15, 1951
*230 Peter J. George, Esq., 305 Broadway, New York 7, N. Y., for the petitioner. Nicholas Tomasulo, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent determined a deficiency in income tax against petitioner for the year 1944 in the amount of $1,545.20. The question presented is whether $5,545.29 of the amount of $9,645.29, received by petitioner in 1944 as compensation for services rendered, constituted "back pay" within the meaning of section 107 (d) (2) of the Internal Revenue Code. Findings of Fact The stipulated facts are found as stipulated and are included herein by this reference. Petitioner is a resident of Brooklyn, New York, and filed his income tax return for the year 1944 with the Collector of Internal Revenue for the First District of New York. In the return petitioner reported as income salary received from Madame Sabo, Inc. during 1944 in the amount of $9,645.29, of which he treated $5,545.29 as "back pay" within the meaning of section 107 (d) (2) of the Internal Revenue Code. In computing the tax the years for which "back pay" was claimed were 1933 to 1937, *231 both inclusive, 1939, 1940 and 1941. Prior to January 29, 1932, Mathilda Sabo operated an embroidery business in the city of New York under the name of Madame Sabo. At that time petitioner was employed as a salesman. On January 20, 1932, petitioner entered into an agreement with Mathilda Sabo and her husband, Louis Sabo, in contemplation of the incorporation of the business. It was provided in the agreement, inter alia, that petitioner and Mathilda Sabo would each purchase 50 shares of the capital stock of Madame Sabo, Inc., which shares were to be without par value; that they would pay for the shares by transferring all their right, title and interest in and to the furniture, fixtures, machinery and stock of the existing business to the corporation; that petitioner and Mathilda Sabo would each loan to the corporation $1,000; that they, and a person appointed by them, would constitute the board of directors; that Mathilda Sabo would be president and petitioner would be secretary and treasurer; that "each of them shall devote their entire time, effort and energy for the benefit and for the welfare of the corporation; that the salaries of each of the said parties * * * shall be the *232 sum of Forty Dollars ( $40) per week for each of them"; that the net profits of the corporation would be apportioned equally between petitioner and Mathilda Sabo at the end of each fiscal year; and that Louis Sabo shall be employed by the corporation "as manager, foreman and general man at a salary of Thirty-five Dollars ($35.00) per week." The business was incorporated on January 29, 1932, with the corporate name Madame Sabo, Inc. Fifty per cent of the non-par value stock was issued to petitioner and 50 per cent was issued to Mathilda Sabo. The agreement of January 20, 1932 was adopted by corporate action to be effective from January 29, 1932. Petitioner and Mathilda Sabo executed their bill of sale on January 29, 1932, through which they conveyed to the corporation all furniture, fixtures, machinery and stock in trade used by them in the business they had previously conducted as Madame Sabo. Petitioner paid in approximately $2,000 in cash. There were some debts outstanding at the time the business was incorporated and they were paid from the $2,000 paid in by petitioner. The book capital of Madame Sabo, Inc. at the time of incorporation was shown as $3,714.59. Mathilda Sabo became *233 president of the corporation and petitioner, secretary and treasurer. They were also named as two of the three directors. Rose Sonnenschein became the third director. Petitioner held the offices of secretary and treasurer until December 31, 1948, and has been an officer and a stockholder of the business since its incorporation until the present date. The minutes of a stockholders meeting on December 24, 1934, show the adoption of a resolution to the effect that officers salaries be increased to $50 per week effective January 1, 1935. By 1944 Louis Sabo had become an officer and stockholder in the corporation. On June 1, 1944, Madame Sabo, Inc. made application to the Salary Stabilization Unit, Bureau of Internal Revenue, for increases in the compensation of its three officers from $2,600 to $5,200. On July 5, 1944, the corporation was notified that the Unit had approved salaries of the officers at $3,900. On July 13, 1944, the corporation requested a review of the Unit's action and after holding a conference with petitioner on August 1, 1944, the Unit, on August 5, 1944, approved salary increases of the respective officers to $5,200. Madame Sabo, Inc. sustained cash losses for *234 the years and in the amounts listed below: Corporation Loss
Year
for the year
1932
$1,894.30
1933
483.28
1934
127.08
1935
122.47
1936
33.41
1937
158.75
1938
17.77
1939
993.76
1940
609.71
1941
1,278.80
1942
4,680.56
1943
$636.78 - Profit
1944
$2,450.53 - Profit
The cash balances for the corporation at December 31 for the period commencing December 31, 1932 to December 31, 1942 were as follows: Year
Amount
December 31, 1932
$ 17.91
December 31, 1933
24.95
December 31, 1934
260.51
December 31, 1935
25.08
December 31, 1936
173.33
December 31, 1937
24.49
December 31, 1938
42.60
December 31, 1939
79.26
December 31, 1940
865.59
December 31, 1941
419.11
December 31, 1942
71.37
(overdraft)
Petitioner received and reported the following as earnings from Madame Sabo, Inc. for the following years: Year
Received and Reported
1932
$ 828.93
1933
764.16
1934
1,297.70
1935
1,704.97
1936
2,301.41
1937
2,131.75
1938
2,726.25
1939
1,870.00
1940
2,017.70
1941
2,606.03
1942
2,235.89
1943
3,919.92
Madame Sabo, Inc., in its 1944 income tax return took a deduction for *235 salaries paid to its officers in the respective amounts: Mathilda Sabo, President
$8,011.84
David Glickman, Secretary-Treasurer
9,645.29
Louis Sabo, Vice President
6,616.65
Petitioner in his 1944 return, showed his salary adjustments for the years 1932 through 1944, as follows: Total Income
Reported on
Back Pay Re-
Original tax
Adjusted
ceived in 1944
Adjusted
(Included
Tax
Applied as
Year
Received
Back Pay
Income
Mrs. G.) Returns
Follows
1932
$ 828.93
$1,251.07
$2,080
$2,080.00
1933
[1] 744.16
1,315.84
2,080
2,080.00
$1,224.71
1934
1,297.70
782.30
2,080
$1,297.70
2,080.00
782.30
1935
1,704.97
895.03
2,600
1,704.97
2,600.00
895.03
1936
2,301.41
298.59
2,600
2,301.41
2,600.00
298.59
1937
2,131.75
468.25
2,600
2,131.75
2,600.00
468.25
1938
2,726.25
(126.25)
2,600
2,726.25
2,726.25
0
1939
[2] 1,670.00
930.00
2,600
** 2,855.71
3,785.71
930.00
1940
2,017.70
582.30
2,600
** 4,905.70
5,488.00
582.30
1941
2,606.03
(6.03)
2,600
2,606.03
2,606.03
0
1942
2,235.89
364.11
2,600
2,235.89
2,600.00
364.11
1943
3,919.92
(1,209.92)
2,710
3,919.92
2,710.00
0
1944
9,645.29
(5,545.29)
4,100
4,100.00
$5,545.29
*236 The corporation followed a practice of discounting its accounts receivables with a factor or factors rather than that of making the collections itself. Petitioner and Mathilda Sabo did not always receive the same amounts from the corporation as compensation but usually there was not a great difference at the end of the year in the aggregate of the amounts they received. Opinion The petitioner contends that of the $9,645.29 received by him in 1944 as compensation, $5,545.29 was back pay attributable to services rendered in prior years, within the meaning of section 107 (d) of the Internal Revenue Code. [1] More particularly, the petitioner contends that for the years 1933 to 1944 the corporation, by reason of its liability for amounts due and owing by it to its officers for services rendered in those years, was insolvent, and in such circumstances, the amounts paid in 1944 and claimed as back pay fall within the provisions of section 107 (d) (2) (iv) of the Code. Relying *237 on that provision, it is argued that while the corporation was not actually in bankruptcy or receivership, as described by section 107 (d) (2) (i), the insolvency or precarious financial state of the corporation made of that condition or circumstance "any other event * * * similar in nature" to bankruptcy or receivership. The petitioner relies on Estate of R. L. Langer v. Commissioner, 183 Fed. (2d) 758, reversing 13 T.C. 419. *238 The difficulty is that, assuming the proposition stated to be legally sound, the petitioner has not established the necessary factual basis therefor. While the record as a whole does indicate that the corporation was, over the years, operating on a narrow margin financially, we cannot say that it was insolvent, even if we accept the view that there was a continuing liability for unpaid salaries, as claimed. When the corporation was organized, it took over the business, including assets, equipment and inventory, of an individual enterprise which previously had been operated by Mathilda Sabo, and the petitioner put in some cash. The petitioner himself when called as a witness could not state what the amount was, but it possibly was somewhere in the neighborhood of $2,000. Some of the cash was used to pay the obligations of the business outstanding at the time of incorporation. About the only other fact which is clear as to financial condition at incorporation is that book capital was shown as $3,714.59. Aside from the corporate resolutions of January 29, 1932, and December 24, 1934, dealing with officers' salaries, the claim that the corporation was rendered insolvent by reason *239 of the existence of liability for unpaid salaries is factually based on the stipulated statements of "cash losses" over the years, and of cash balances at the end of each year, plus the testimony of the petitioner and two other witnesses, who as bookkeepers or auditors had something to do with the corporate books during the period under consideration. The tenor of petitioner's argument seems to be that the statements of "cash losses" and cash balances are sufficient, when effect is given to the claim that liability for unpaid salaries existed, to establish the insolvency of the corporation, notice being taken that the books of account were kept on a cash basis. Assertions and argument are not proof. The books were not produced and we do not know what conclusions might have been drawn from them. The stipulation of "cash losses" and of cash balances is, to say the least, inconclusive. We are not advised as to the effect, if any, given to accounts receivable, accounts payable, or inventory, and the information of record as to machinery, equipment and fixtures is so meager that it may be regarded as inconsequential. In short, we do not know whether the corporation was insolvent, regardless *240 of whether there were existing and continuing liabilities for unpaid salaries to officers. Aside from the question of insolvency of the corporation we do not think that petitioner has shown that there was over the years an existing and continuing liability for unpaid salaries as claimed. It is true that the results of a mathematical computation made on the basis of the resolution of January 29, 1932 and December 24, 1934, would, after making allowance for the salary payments actually made, reflect back pay in the amounts and for the years claimed. It is admitted that the items in question were not carried on the books of account. It is claimed, however, that the books were kept on a cash basis and the salary items, being accrued but unpaid liabilities, would not properly appear therein. The fact is we do not know with any certainty just how the books were kept. The 1932 and 1944 returns which are in evidence bear statements that they are cash basis returns. The same is true of the 1934 return from which one witness testified to some extent. In the 1932 return the cost of goods sold was shown by the use of inventories and both the 1932 and 1934 returns carried balance sheets at the *241 beginning and end of the year. The 1932 balance sheets carried accounts receivable, inventories, other investments, capital assets, accounts payable and as of the end of the year $290 as salaries payable. The balance sheet constituting part of the 1934 return showed unpaid salaries as of the beginning of the year at $999 and at the end of the year $970. It thus appears that assets and liabilities accounts were maintained in some manner whether the books as a whole be regarded as having been kept by an accrual method or on a cash basis. Of greater significance, however, is the fact that even though there was a representation of existing and accrued liabilities, including liability for unpaid salaries, the salary item shown at the end of 1932 and at the beginning and end of 1934 did not include the salary items involved in this case. If it had been intended that the corporation should be liable over the years as here claimed, and it was so liable, then at the end of 1932 there should have been included in the liability item of salaries $1,091.07 as the amount owing to petitioner alone and at the end of 1934 there should have been included on account of liability to petitioner for unpaid *242 salaries a total of $3,189.21. The only explanation offered was by the man who set up the books and kept them for a number of years and to say merely that the tenor and purport of the explanation made is not clear is a charitable statement. The explanation was "* * * in so far as the balance sheet reflected cash income for the year in order if I were to show all the liabilities after a minus on income, net income, which would more or less prove that there was no particular business at that particular year." On the record made we are not convinced that the corporation and its officers actually regarded the amounts in question as being due and owing over the years. From the picture as a whole we are constrained to conclude that the claim that the differences between the amounts paid and those computed pursuant to the resolutions were continuing liabilities of the corporation was in reality an after thought and nothing more. Though the existence of the corporation is not here in question the testimony and other evidence of record indicate that the actual operations were as informally conducted as if they had been the individual operations of petitioner, Mathilda Sabo, and her husband. *243 They did go through the formality of placing the salary resolutions upon the minute books but from the incompleted state of the minute forms which were placed in evidence there might well be some basis for doubt as to whether or not corporate meetings did in fact occur. With respect to the resolution of January 29, 1932, it is to be noted that it also provided that after the amounts designated as salaries were paid the remaining profits were to be divided 50 per cent to Mathilda Sabo and 50 per cent to petitioner [2] In other words the resolution as adopted provided for the disposition of the entire profits of the corporation, what they might be, without leaving the matter to later and current action of the board of directors or stockholders as is the usual case in handling corporate affairs. If they intended the resolutions as an effective determination of officers' salaries from year to year without regard to earnings, then we must conclude that their failure to carry liability therefor in the balance sheets made as a part of their income tax returns puts them in a light of actual, if not deliberate, misrepresentation of the financial condition of the corporation. We are rather of *244 the opinion that the situation here was in over-all effect similar to that which existed in the case of Stern-Slegman-Prins Co. v. Commissioner, 79 Fed. (2d) 289, where before the end of each year the salaries of the three owners of the corporate business were adjusted downward from the established salaries as of the beginning of the year to coincide with the amounts actually drawn during the year. The difference between the two cases is that there the corporate owners did currently indulge in the formality of reducing salaries to the amounts paid as of the end of the year whereas in this instance the acts and attitude of the owners of Madame Sabo, Inc. as reflected in the over-all picture rather indicate that they did not regard the resolutions of January 1932 and December 1934 as having definitely established liability for salaries over and above the amounts currently paid. Norbert J. Kenny, 4 T.C. 750; *245 James Newton Dean, 10 T.C. 672, and Frederick H. Hagner, 14 T.C. 643, cited and relied on by petitioner are distinguishable and that without regard to the soundness of petitioner's contention as to the scope and meaning of section 107 (d) (2) (iv), supra, Estate of R. L. Langer v. Commissioner, supra, likewise is not in point for the reason that petitioner here has not established the insolvency of the corporation. Decision will be entered for the respondent. Footnotes
1. Stipulated as $764.16. ↩
2. Stipulated as $1,870. ↩
**. Includes Mrs. Glickman's earnings. There is no explanation of why adjusted income for 1943 is $2,710 rather than $2,600.↩
1. SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY. * * *
(d) BACK PAY. - (1) In General. - If the amount of the back pay received or accrued by an individual during the taxable year exceeds 15 per centum of the gross income of the individual for such year, the part of the tax attributable to the inclusion of such back pay in gross income for the taxable year shall not be greater than the aggregate of the increases in the taxes which would have resulted from the inclusion of the respective portions of such back pay in gross income for the taxable years to which such portions are respectively attributable, as determined under the regulations prescribed by the Commissioner with the approval of the Secretary. (2) Definition of Back Pay. - For the purposes of this subsection, "back pay" means (A) remuneration, including wages, salaries, * * * received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events: (i) bankruptcy or receivership of the employer; (ii) dispute as to the liability * * *; (iii) if the employer is the United States, a State * * *, lack of funds appropriated to pay such remuneration; or (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary; * * *↩
2. At some undisclosed date Mathilda Sabo's husband became a stockholder but we do not know what the stockholdings were thereafter. Neither are we advised as to whether any action was taken with respect to the profits, if any, over and above current salaries to officers.↩